IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CHRISTIAN THOMAS, *et al.* | * | |
| Plaintiffs | * | |
| v. | * | Civil Action No.: PJM-17-2954 |
| | | (Consolidated Cases: PJM-18-282; |
| ACTING WARDEN GWENDOLYN OLIVER | * | PJM-18-362; PJM-18-396; PJM-18-445) |
| ACTING ASST WARDEN DONNA HANSEN | | |
| | * | |
| Defendants | | |

\*\*\*

**<u>MEMORANDUM OPINION</u>**

These consolidated civil rights cases were filed by federal pre-trial detainees who are, or were[1] at the time the complaint was filed, confined to the Chesapeake Detention Facility ("CDF") in Baltimore, Maryland claiming the conditions at the facility violate constitutional standards and seeking injunctive relief. In response Defendants filed a Motion to Dismiss or for Summary Judgment. ECF No. 72. The motion is opposed by Plaintiff Donald McDuffin Williams (ECF No. 76)[2] who also moves for appointment of counsel (ECF No. 69) and for default judgment (ECF No. 74). The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, and based upon the evidence presented, Defendants' motion shall be granted, the complaints shall be dismissed without prejudice for failure to exhaust administrative remedies, and the motions for injunctive relief shall be denied.

---

[1] While this case was pending several of the plaintiffs have either been released or transferred elsewhere and did not notify this Court of their new address. Because the Court was not notified of a new address, the complaint as to Plaintiffs Aaron Smiley, Garcia Fajardo, Mohamed Elshinawy, Robert Butler, Rashon Pratt, Brent Davis, Victor Marin, and Travante Brown was dismissed without prejudice on June 12, 2018. ECF No. 68. Since that date, mail sent by the Clerk has been returned as undeliverable as to Plaintiff Juan Carlos Amaya. ECF No. 70. The complaint as to Amaya shall likewise be dismissed without prejudice.

[2] Each Plaintiff was notified of his right to file an Opposition Response and of the consequences of failing to do so pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). ECF No. 75.

Because the complaints must be dismissed on this basis, the pending motion for appointment of counsel shall be denied.

## Background

### Plaintiffs' Claims

Plaintiffs assert that Defendants, the acting warden and assistant warden of CDF, knew about and disregarded environmental hazards within the prison including the existence of black mold and dust. ECF No. 1 at p. 3; ECF No. 13 at p. 2; ECF No. 36 at p. 6; ECF No. 39 at p. 6; ECF No. 41 at p. 6; ECF No. 43 at p. 6. Plaintiff Williams asserts that on June 24, 2017, he notified Defendants that there is waste material, including human feces, rotting garbage, cockroaches, and mice in the bottom of "more than one pipe chase" and that there were stagnant pools of water, clogged drains, mold and mildew in the showers. ECF No. 1 at p. 4.

In response to Williams's complaint, Oliver responded on July 7, 2017, as follows:

> Thank you for your inquiries referencing the facility. As there are challenges referencing the physical structure due to age, we have a team of staffers working very hard to ensure the upkeep of the facility. We are accredited by the American Correctional Association, Maryland Commission on Correctional Standards, National Commission on Correctional Health and the Federal QAR – Quality Assurance Review.

ECF No. 1-2 at p. 1. Williams states that Oliver did not address any of the particular hazards he noted in his complaint. ECF No. 1 at p. 4.

On September 19, 2017, an annual re-accreditation audit took place at CDF and Williams claims the facility's Dietary Department failed to pass inspection because of numerous violations, notably, the presence of mold. Following that failure, Williams states that Oliver closed the Dietary Department as of September 21, 2017, until further notice. ECF No. 1 at pp. 4-5.

In his supplemental complaint, Williams states that he is "an on-call 24 hour service maintenance worker who has been working in this position since December 13, 2016." ECF No. 13 at p. 3. He claims that because Defendants did not take action to remedy the conditions at CDF about which he complained in writing, he "is now experiencing continued nasal irritation, throat and sinus infections, shortness of breath, and skin rashes." *Id*. at p. 4. He further alleges that he has not been provided proper medical treatment for these symptoms. *Id*. Williams cites *Maxie v. Levenhagen*, 2014 WL 3828292 at *1 (N.D. Ind. Aug. 4, 2014) for the proposition that the presence of black mold and mildew satisfies the objective element of an Eighth Amendment claim provided that the plaintiff alleges he suffers or is at substantial risk of suffering an injury or health problem as a result. *Id*.

In the complaints filed by Gilbert Davis (ECF No. 36), Mitchell Brooks (ECF No. 39), Thomas Hearn (ECF No. 41), and DeMarcus Moore (ECF No. 43), which were consolidated with the lead case and are identical in content, plaintiffs state they are double-celled in cells that were designed to house only one person requiring them to share 30 to 35 square feet with a cellmate. ECF No. 36, 39, 41, and 43 at p. 2 (hereinafter "Consolidated Complaints"). They explain that the bed in the cell, which is a bunk-style bed, takes up approximately 20 square feet of the space making the actual floor space approximately 20 to 24 square feet, disregarding the possible presence of other furniture in the cell. *Id*. at p. 3. They allege this violates the American Correctional Association (ACA) standards as well as the Department of Public Health (DPH) regulations. *Id*. In addition, they claim that "numerous professional and correctional organizations have promulgated 'minimum standards' for cell size" ranging from 49 square feet to 90 square feet. *Id*. at pp. 3-4, citing National Sheriff's Association; Building Officials and Code Administrators, Inc. BOCA Basis Building Code, 1975, §201.3; National Clearinghouse

for Criminal Justice Planning and Architecture; ACA, Manual of Correctional Standards, 49; National Advisory Commission for Criminal Justice Standards and Goals, Corrections standard 11.1, p. 353; The International Conference of Building Officials, Uniform Building Code §1307B, p. 83; American Public Health Association; Federal Standards for Prisons and Jails, 1980, §§2.02-2.06. Specifically, they state that the Federal minimum standard is 50 square feet in holding facilities; 60 square feet for regular cells where inmates are held for less than 10 hours per day; 70 square feet in detention facilities where inmates are held for more than 10 hours per day; and at least 80 square feet in long term facilities. Consolidated Complaints at p. 4.

They claim that the population at CDF "far exceeds the ability to allow 35 square feet of day space per inmate." *Id*. They maintain that a day room is required to provide 35 square feet of floor space per inmate, excluding lavatories, showers, and toilets, and must provide sufficient seating, writing and eating surfaces. *Id*. At CDF, however, in C Tier, Quad 4, the dayroom which serves as the dining area does not provide enough tables for the inmates to sit requiring some to eat their meals in their cells, near a toilet. *Id*.

Plaintiffs state that CDF does not provide one operable shower for every 16 inmates, as required. *Id*.

The facility is not air-conditioned and Plaintiffs state that temperatures reach 100 degrees in the Summer. In the Winter months, it is so cold inside the facility that "prisoners can see their breath." *Id*. at p. 5. The ventilation system at CDF consists of "a primitive blower system" that uses a "fan [to] bring in air from outside while others pull out the internal air." *Id*.

Plaintiffs claim that CDF is "filled" with vermin, mice, cockroaches, and flies. *Id*.

They claim the plumbing is antiquated, deteriorated, and needs replacement. They assert it has "simply broken down from years of very heavy use without adequate preventative

4

maintenance." *Id*. The drains is the dietary area are "rotten and frequently clog, causing raw sewage to back up into the dietary floor." *Id*. Plaintiffs state that the "grease traps/caps are missing, allowing a nauseating and foul gas to escape into the prison" causing "disease hazards in the kitchen." *Id*.

They claim the kitchen at CDF is actively infested with mice, roaches and flies; contains pools of standing water, and deposits of grease and grime on exposed surfaces as well as condensation that drips from surfaces potentially into food. Consolidated Complaints at pp. 5-6. Further they claim that food contact surfaces are unsanitary; food preparation equipment has dried food residue on it; and the tray washing machine was not operational for approximately six months. *Id*. at p. 6.

They claim the noise level inside the facility is "annoying and irritating over time" and is "so intolerable and intrusive that it renders the unit unfit for human habitation." *Id*.

As relief, the Plaintiffs seek a declaratory judgment finding that Defendants' failure to correct conditions to ensure prisoners are not exposed to black mold is a violation of the Eighth Amendment; their failure to provide adequate medical care violates the Eighth Amendment; and the conditions at CDF are so harsh and punitive that Plaintiffs are entitled to a downward variance or hardship credit toward their sentences. *Id*. at p. 7. They further seek an injunction ordering Defendants to arrange for each of them to be examined by a doctor and to provide follow-up medical treatment as required. *Id*. Plaintiffs also seek compensatory and punitive damages. *Id*. at p. 8.

In their Motions for Temporary Restraining Order and Preliminary Injunction, Plaintiffs seek orders requiring Defendants to provide them with proper medical care to treat nasal

irritation, throat and sinus infections, shortness of breath, and skin rashes, they attribute to their exposure to black mold. ECF Nos. 15, 38, 40, 42.

Defendants' Response

Defendants assert that CDF was accredited by ACA in February of 2014 and August of 2017. ECF No. 72 at Ex. 1, pp. 1, 4-5. The audit that occurs before accreditation is issued includes assessments of administration and management, the physical plant, institutional operations and services, and detainee or inmate programs. *Id*. at p. 1. The audit also addresses issues and concerns affecting quality of life including staff training, adequacy of medical and mental health services, sanitation, use of segregation and detention, incidents of violence, overcrowding, and provision of other basic services that impact on the life, safety, and health of both inmates and staff. *Id*. Defendants tout the ACA as a "rigorous peer review process based on national standards" and note that the accreditation process occurs every three years. *Id*. The certificate indicating CDF is accredited refers to the process as "a rigorous self-evaluation, followed by an outside review by a team of experienced, independent auditors." *Id*. at pp. 4 & 5.

With regard to the space provided within the facility, Defendants state that the 7 feet by 12 feet cells in CDF provide a total of approximately 84 square feet with 52.4 square feet of open space per cell. ECF No. 72 at Ex. 2, p. 1; Ex. 3, p. 2. They aver that the dayroom provides 25 square feet per inmate, meeting the minimum requirement under the ACA standard. *Id*. at p. 3. They state, without revealing the total number of prisoners detained at CDF, that there is one shower for every 24 inmates. *Id*. at Ex. 2, p. 1. They admit, however, that ACA standards require one shower for every 12 detainees, or twice the number of showers that currently exist, but state that they have passed previous ACA audits because the "physical plant does not allow for additional showers." *Id*.

Defendants admit there have been problems with the heating system at CDF and note that the facility was built in 1986 and opened for occupancy in 1988. *Id*. In January of 2018, the heating system was repaired and a project to air condition the housing units is currently underway. *Id*.

An extermination company, Queen B Pest Control Company, is contracted to visit CDF on a weekly basis to treat for pests. ECF No. 72 at Ex. 3, p.5; Ex. 2, p. 2. Defendants state that there is no active infestation of mice, roaches, or other pests in the kitchen. *Id*. at Ex. 2, p. 2. The kitchen is cleaned throughout the workday and then thoroughly cleaned at the end of the day before it is closed for the day. *Id*. Defendants don't deny the tray cleaning machine has been broken, but state that when it has been broken, meals are served on Styrofoam trays and a repair company is called immediately. *Id*. Defendants further note that the presence of pests can be more easily controlled when detainees keep their cells clean and meal trays are returned to staff immediately after meals are completed. *Id*.

With regard to general repairs, Defendants state that all staff are required to file a matter of record documenting any problem they encounter and to contact the maintenance department. ECF No. 72 at Ex. 2, p. 2. While some detainees had to be relocated in January of 2018 when there was an issue with the heating system, there has not been any other recent catastrophic system failures requiring relocation of detainees. *Id*.

To maintain the repair of each cell, Defendants state that after a detainee is removed from a cell and before another is placed in the cell, the cell is cleaned and the light, toilet, and sink are checked to ensure they are in working order. *Id*. If something requires a repair, an order is completed for the repair and if the cell is not operational, the detainee is placed in a different cell. *Id*.

The only information provided by Defendants regarding the number of detainees assigned to each cell is in the declaration of Warden Alexander. ECF No. 72 at Ex. 1, p. 1. She states that "CDF detainees and inmates are housed either alone in a cell or in a cell with another detainee or inmate." *Id*. at ¶ 1. Nothing further regarding the capacity of CDF, the total current population, or the population of detainees relevant to the time covered by the complaints is provided.

With regard to the noise levels in CDF, Defendants claim that correctional officers instruct detainees who are talking loudly, or otherwise adding to the noise level, to lower the noise level. ECF No. 72 at Ex. 2, p. 2, ¶9. However, Defendants also state that detainees are the ones largely responsible for keeping the noise levels down. *Id*.

Defendants explain that the dietary department was in fact closed from September 21, 2017 through November 8, 2017, but it was not because of unsanitary conditions. Rather, it was closed for the purpose of implementing a "major overhaul" with new equipment and updated electrical and lighting features installed. *Id*. at ¶13.

With regard to delivery of medical services, Warden Alexander states that the private medical contractor is responsible for medical care of the detainees. ECF No. 72 at Ex. 1, p. 2, ¶3. She explains she has no authority to make decisions concerning any detainee or inmates medical care, nor does she have the authority to force medical staff to perform a particular medical procedure or treatment. *Id.* Further, she states that monitoring of the provision of medical services for CDF detainees or inmates is the responsibility of the staff at the Department of Public Safety and Correctional Services (DPSCS) headquarters. *Id*. When a detainee or inmate needs medical attention, they must fill out a sick call slip which is collected and reviewed by the medical contractor. *Id*. at ¶ 4. Appointment dates and times are determined by medical

personnel. *Id*. Alexander states he relies on the expertise of medical staff with regard to the treatment of the detainees and inmates. *Id*.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Injunctive Relief

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at, 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

The pending Motions for Temporary Restraining Order fail because there is no likelihood of success on the merits of the claims asserted. There is no dispute that Plaintiffs failed to exhaust administrative remedies and that failure is a complete bar to this lawsuit. The motions shall be denied.

### Exhaustion of Administrative Remedies

Defendants raise the affirmative defense of failure to exhaust administrative remedies in response to the complaints. ECF No. 72. If Plaintiffs' claims have not been properly presented

through the administrative remedy procedure the claims must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004). Thus, detainees aand inmates at CDF must exhaust administrative remedies provided under Federal Bureau of Prison regulations prior to seeking judicial relief. *See Pelissero v. Thompson*, 170 F.3d 442, 445 (4th Cir. 1999); *Rodriguez v. Lamer*, 60 F.3d 745, 747 (11th Cir. 1995); *United States v. Keller*, 58 F.3d 884, 894 (2d Cir. 1995); *United States v. Bayless*, 940 F.2d 300, 304-05 (8th Cir. 1991).

Under 28 C.F.R. § 542.13 an inmate must first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Pursuant to 28 C.F.R. § 542.14, the deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9) obtained from institution staff, is 20 calendar days following the date on

which the basis for the Request occurred. 28 C.F.R. § 542.15 governs appeals and provides that an inmate who is not satisfied with the Warden's response to a complaint may submit an appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response. An inmate who is not satisfied with the Regional Director's response may submit an appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response. When the inmate demonstrates a valid reason for delay, these time limits may be extended. Appeal to the General Counsel is the final administrative appeal.

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo*

*v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 136 S.Ct. 1850 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id*. at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Defendants state that of the plaintiffs named, only four filed informal complaints regarding the conditions at CDF: Gilbert Davis, Corey Hammond, Donald Williams, and DeMarcus Moore. ECF No. 72 at Ex. 1, p. 2, ¶ 6. None of them appealed the response received. *Id*. The Informal Complaint Coordinator, Sgt. Sheila Jefferson also provides a declaration under

oath confirming that only four of the plaintiffs filed an informal complaint. *Id*. at Ex. 6. Jefferson further states that informal complaint forms are readily available at CDF and each detainee and inmate are provided with a handbook upon arrival in which the procedure is described. *Id*.

In rebuttal, Plaintiff Donald Williams states that his informal complaint was addressed directly to and answered by Acting Warden Oliver. ECF No. 76 at p. 4. He reasons that because the informal complaint was answered by the warden, appealing the response to the warden became unnecessary. *Id*. He states Oliver was the final arbiter of the complaint and any "appeal" would be more akin to a motion for reconsideration which is not required as a step in exhaustion of administrative remedies. *Id*. Although Williams does not attempt to speak for the other plaintiffs, he observes that three out of the four informal complaints filed were directed to the warden. *Id*.

Notwithstanding Williams's opinion as to the efficacy of appealing the response he received from the Warden on his informal complaint, properly exhausting administrative remedies is required. "[P]roper exhaustion of administrative remedies . . . 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 90, quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (Emphasis and parenthesis in original). Williams's explanation for failing to take any further steps does not fit within any of the three circumstances making an administrative procedure unavailable as outlined by the Supreme Court in *Ross*. *See Ross*, 136 S.Ct. at 1859-60. Rather, Williams appears to belong to that class of litigants described by the Supreme Court in *Woodford* who simply prefer to file their complaints directly with the federal courts without providing the administrative agency with the opportunity to address the claims raised. As a result of

prematurely filing this complaint, Plaintiffs have not only denied Defendants the opportunity to correct conditions that may be hazardous or at the very least uncomfortable, but they have also ensured there would be little to no documentary evidence for this Court to consider with regard to the merits of their claims because their claims were not fully investigated. For these reasons, the claims shall be dismissed without prejudice in a separate Order which follows.

Defendants' assertion of a qualified immunity defense is not here considered in light of the disposition noted.

July 30, 2018

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE